**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (SBN 175650)
ron@consumersadvocates.com
MICHAEL T. HOUCHIN (SBN 305541)
mike@consumersadvocates.com
651 Arroyo Drive
San Diego, CA 92103
Tel: (619) 696-9006 / Fax: (619) 564-6665

**COHELAN KHOURY & SINGER**
ISAM C. KHOURY (SBN 58759)
ikhoury@ckslaw.com
TIMOTHY D. COHELAN (SBN 60827)
tcohelan@ckslaw.com
J. JASON HILL (SBN 179630)
jhill@ckslaw.com
605 C Street, Suite 200
San Diego, CA 92101
Tel: (619) 595-3001/ Fax: (619) 595-3001
*Counsel for Plaintiff Jasmine Miller and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| JASMINE MILLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, LLC, a Delaware Limited Liability Company;  and DOES 1 through 500, inclusive,<br><br>Defendants. | Case No. 17-CV-03488-MMC<br><br>*FOURTH AMENDED* CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL**<br><br>REDACTED VERSION OF DOCUMENT TO BE SEALED. |

Plaintiff Jasmine Miller ("Plaintiff" or "Miller"), on behalf of herself, all others similarly situated, and the general public, alleges against Defendant Amazon.com, LLC, a Delaware Limited Liability Company (hereinafter "AMAZON"), the following facts based upon personal knowledge, or where there is no personal knowledge, upon information, belief, and/or the investigation of counsel.

## INTRODUCTION

### A.    The Human Cost of Amazon's "Free Shipping"

1.    AMAZON is an employer of a class of California drivers known as "Delivery Associate Participants" or "Delivery Drivers" and exercised control over all aspects of their delivery duties.  The Delivery Associate Participant ("DAP") Program was designed and implemented by Amazon as a way to standardize a process efficiently at a low cost to AMAZON.

2.    Much of the cost of the DAP program fell on the class members.[1]  These Delivery Drivers were generally persons of modest means, many from vulnerable or "at risk" socio-economic communities. Class Representative Jasmine Miller, a 23-year-old African American woman, was a typical Delivery Driver Participant.

### B. AMAZON's Delivery Service Provider ("DSP") Program Causes California Wage Violations

3.    AMAZON was able to direct and control the Delivery Drivers while maintaining an air of plausible deniability. AMAZON's upper management and counsel designed the program in such a manner that its sub-contractors provided a legal barrier; the sub-contractors acknowledged an employment relationship with the participants and issued W-2s. These sub-contractors are known as Delivery Service Partners ("DSPs"). However, the premise that the DSPs were the exclusive employers of the Delivery Drivers is illusory. As shown in the graphic on the following page, AMAZON had direct control over each Delivery Driver regardless of the Driver's DSP:

---

[1] *See* Business Insider articles attached hereto as Exhibits 1 and 2.

## Amazon.com. LLC's California Delivery Operations



### Defendant Amazon.com, LLC



**A M A Z O N   C O N T R O L S   D E L I V E R Y   D R I V E R S**

AMAZON requires all DSPs to implement the same Delivery Associate Participant Guide

### Delivery Service Providers ("DSPs")
(Examples include 1-800 Courier, SMX, NEA Delivery, and SoCal Messengers)

  

### California Drivers / Delivery Associate Participants ("DAPs")
### ***The Class Members***

#### AMAZON directly controls all drivers in a common manner:

- AMAZON assigns the routes of all drivers through its hand-held devices and tracking software known as the "Rabbit" and "DORA." All drivers were uniformly denied meal breaks, rest breaks, and overtime in a common manner.
- All drivers must uniformly adhere to AMAZON's Delivery Associate Participant Guide.
- AMAZON requires each driver to complete the same orientation and training.
- AMAZON requires each driver to undergo a systematic background check before being permitted to Amazon facilities.
- AMAZON monitors and tracks in real time each driver's geolocation, package delivery rate, and non-deliverable packages. The DSP has no control over Amazon's routing.
- AMAZON monitors any and all non-deliverable packages ("Concessions") by each delivery driver for each shift in real time. AMAZON disciplines drivers for a high rate of concessions.
- All drivers must wear AMAZON uniforms.
- Other examples are provided within this complaint.

**T I M E   A N D   P E R F O R M A N C E   R E C O R D S   G O   T O   A M A Z O N**

**C. Amazon's Direct Control of Delivery Associate Participants**

4.     The Delivery Drivers were directed and controlled by AMAZON through the DAP process by using AMAZON's electronics, algorithms, software, hardware, and dispatch device— the TC-55 hand-held scanner.  The TC-55 and AMAZON's software were referred to as the "Rabbit" and the "DORA."[2]

5.     The TC-55 "Rabbit" and "DORA" devices were prominent features in the DAP training materials and were the primary tools used to direct and control the Delivery Drivers. AMAZON used its hand-held scanners to track and discipline Delivery Drivers. There were specific criteria set forth that would define Delivery Driver errors. The term for Delivery Driver errors was defined in AMAZON's Delivery Associate Participant Guide ("DAPG")[3] as "concessions." For example, an undelivered packaged returned at the end of the day was a concession.  Amazon programmed its TC-55 Rabbit and DORA devices with codes to explain the reasons for a non-delivery.

6.     AMAZON's control extended to specific, standardized delivery protocols, policies, and procedures as described in the Delivery Associate Participant Guide given to every Delivery Driver. The Delivery Associate Participant Guide requires Delivery Drivers to: wear a specific uniform (i.e. black shoes and pants, amazon shirt and jacket, safety vest, and a badge); wear keychain lanyards, which had to be attached to the vehicles keys at all times, as part of the uniform standard; take with them and utilize AMAZON's "We Missed You" cards when leaving packages for customers; take with them and utilize AMAZON's "Delivery Attempt Labels" when unable to deliver packages for customers; use AMAZON's TC-55 device during every step of delivering a package; use AMAZON's TC-55 device to scan each package, select where the Driver left each package, or select a reason for not delivering a package, which permitted AMAZON to keep track of all

---

[2]   DAP training materials sometimes would refer to the TC-55 and the accompanying software as either the "Rabbit" or "DORA" applications.
[3]   A copy of AMAZON's DAPG pertaining to the Rabbit device is attached hereto as Exhibit 3 and a copy of AMAZON's DAPG pertaining to the DORA device is attached hereto as Exhibit 4.

FOURTH AMENDED CLASS ACTION COMPLAINT                    CASE NO. 17-CV-03488-MMC

packages delivered by every Delivery Driver; use the TC-55 navigation feature for each delivery, which permitted AMAZON to keep track of each Delivery Driver's mileage each day; and follow AMAZON's word-for-word script to discuss deliveries with customers.

7.    For example, AMAZON controlled the manner and means of work of the Delivery Drivers by conducting a background check of each Delivery Driver; requiring that each Delivery Driver pass AMAZON's background check before being permitting to work; utilizing a systematic manner of accepting and approving each Delivery Driver (i.e. all Delivery Drivers had to satisfy AMAZON's "Minimum Delivery Personnel Requirements" in order to work as a Delivery Driver); ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████; orienting all Delivery Drivers with the same Amazon training; requiring termination of a Delivery Driver for having too many customer concessions (i.e. mis-deliveries or delivery issues for packages, package theft or package return); and requiring termination of a Delivery Driver when background information changed (i.e., tickets, DUI, suspected theft, etc.).  AMAZON also maintained separate employee identification numbers for each driver irrespective of any unique identification maintained by a DSP.  For example, Plaintiff Miller's AMAZON employee identification number was AZSL200.

**D. The Class and the Legal Claims**

8.    Plaintiff brings this matter as a proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or 23(b)(2) for the following proposed Class:

> **Class**:  All current and/or former hourly (non-exempt) persons in the State of California, who worked as an AMAZON Delivery Associate Participant ("DAP" or "Delivery Driver") any time from four years prior to the date of the commencement of this action until the date notice is disseminated (the proposed "Class Period") and were assigned to deliver local warehouse goods.

9.    Plaintiff reserves the right to amend or modify the proposed Class definition.

10.     Plaintiff brings this matter as a proposed Class Action individually and on behalf of all others similarly situated who work, or have worked, for AMAZON within the State of California at any time during the proposed Class Period, as defined herein. Plaintiff seeks damages, restitution, disgorgement, pre- and post-judgment interest, applicable statutory penalties, attorneys' fees, costs of suit, and any further equitable relief this Court may deem just and proper, under, *inter alia*, California Labor Code §§ 218.5, 218.6, 226, 226.3, 226.7, 226.8, 510, 512, 558, 558.1, 1174, 1174.5, 1194, 1194.2, 1197, 1197.1, 1198, 1400-1404, 2802, 2804, as well as Cal. Code Regs. tit. 8, § 11090 (Industrial Welfare Commission ("IWC") Wage Order No. 9-2001).

## JURISDICTION AND VENUE

11.     Defendant removed this action to this Court on June 15, 2017 pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 from the Superior Court of the State of California, County of Alameda. Based on the removal documents, venue appears proper in the United States District Court, Northern District of California to the extent that this Court has jurisdiction under the Class Action Fairness Act ("CAFA").

## PARTIES

12.     Plaintiff Jasmine Miller, a natural person, is a resident and citizen of the State of California. During the Class Period, Plaintiff Miller was jointly employed by AMAZON as a Delivery Driver providing pick-up and delivery services for AMAZON under a name called "Amazon" and/or the "Amazon Prime" auspices. Her employment ended and she separated from AMAZON on or about July 28, 2016. At all relevant times, Plaintiff Miller and all Class Members were assigned TC-55 devices from AMAZON and were subject to AMAZON's "Delivery Associate Participant Guide" attached hereto as Exhibits 3 and Exhibit 4 and expressly incorporated herein by this reference. At all times, Plaintiff and other Class Members drove vehicles bearing AMAZON logos and uniforms displaying AMAZON's logo as representing to consumers and the general public that all Delivery Drivers were agents and employees of AMAZON.

13.     Defendant Amazon.com, LLC ("AMAZON") is incorporated in Delaware and

headquartered in the State of Washington, with its principal place of business located at 410 Terry Avenue North, Seattle, Washington 98109.

14.     Plaintiff is informed and believes that AMAZON used uniform operating agreements with newly formed DSP entities subject to AMAZON's uniform Delivery Service Provider Agreement to shield AMAZON from liability for violations of California wage and labor laws. AMAZON in this case expressly admits that it contracts with each of its DSPs in California to engage in parcel delivery services critical to AMAZON's business model.

## **GENERAL ALLEGATIONS**

15.     During the Class Period Plaintiff Miller, and each Class Member she seeks to represent, were jointly employed by AMAZON to provide delivery services throughout California. Plaintiff and the Class suffered damages, wage losses, and legally cognizable harm due to AMAZON's unlawful employment policies and practices, and therefore Plaintiff has standing to bring this case individually and as a representative for other similarly-impacted Class Members.

16.     Plaintiff Miller was jointly employed by AMAZON and a DSP as a Delivery Driver between approximately April 2016 and July 2016.

17.     During her employment, Plaintiff was assigned to provide package pick-up and delivery services for AMAZON out of AMAZON's hub/terminal warehouse located at 990 Beecher Street in San Leandro, California 94577. Ms. Miller was compensated for her services at a regular hourly pay rate of approximately $15.00 per hour.

18.     Plaintiff Miller's clock-in/clock-out times and meal periods taken (if any), were logged and tracked through a downloaded application ("app.") on her personal cell phone called "TimeForce." AMAZON required all Delivery Drivers to use the "TimeForce" application irrespective of the particular DSP. Further, all actual package handling was tracked using AMAZON's Rabbit software or a hand-held DORA device, as alleged below. All trucks and vans Delivery Drivers were required to use when making deliveries were fitted with global positioning satellite ("GPS") devices to track movement

and monitor route delivery progress. Comparison of AMAZON's delivery records and AMAZON's GPS data with punch cards "hours worked" logged in "TimeForce" will show substantial deviation in actual hours worked and driving performed by Delivery Drivers that went unpaid, resulting in millions of dollars' worth of uncompensated wages.

19.    Plaintiff Miller is owed at least $1,000.00 to $3,000.00 from AMAZON for failure to comply with California wage and hour laws/regulations. This amount accounts for at least two premium wage payments per each day of her employment for non-compliant meal and rest periods; off-the-clock pay of at least 3.5 hours per day during her first two weeks of employment, and approximately 1-2 hours per week thereafter until her termination/separation on or about July 28, 2016, in an amount according to proof and subject to economist review and calculation, including derivative claims for wage statements (Labor Code section 226). Plaintiff will provide a more precise estimate as to unpaid wages after discovery and production of actual time and delivery records are produced and expects to retain consultants to calculate Plaintiff's and the Class Members' losses.

## The Applicable California Law

20.    California's evolving employment law has clarified employment relationships in the digital economy. California courts now utilize a broad test and provide additional protection for California workers.

21.    Under the Industrial Welfare Commission ("IWC"), the term "to employ" has three alternative definitions. To employ means "(a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Martinez v. Combs*, 49 Cal. 4th 35, 71, (2010), *as modified* (June 9, 2010). The IWC's definition of an "employer" encompasses "'any person ... who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person,'" and "is broad enough to reach through straw men and other sham arrangements to impose liability for wages on the actual employer." *Id*. at 71.

22.     In *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 416 P.3d 1 (2018), the Supreme Court of California defined the standard that applies under California law in determining whether workers should be classified as employees or as independent contractors for purposes of California wage orders.

23.     As discussed below, AMAZON "employed" the Delivery Drivers such that it is liable as a Joint Employer for the violations complained of in this action.

### AMAZON's Direction and Control over Class Members' Wages, Work Schedules, and Job Duties

24.     AMAZON had the power to supervise, discipline, and fire Delivery Drivers, and provides the training, location, and resources needed to perform AMAZON's work. The work performed by Delivery Drivers requires no particular specialized knowledge or skill and is part of the regular business in which AMAZON retained pervasive control over and jointly benefitted financially therefrom.

25.     In addition to controlling routing and package delivery service routines of the Delivery Drivers, AMAZON approved the hiring and controlled the discipline and firing of Delivery Drivers. Specifically, all potential Delivery Drivers in California were subject to AMAZON's uniform screening process and had to meet AMAZON's minimum requirements to get hired as a Delivery Driver. If a Delivery Driver failed AMAZON's screening process, that Driver could not enter AMAZON terminals/warehouses or yards. Similarly, AMAZON used hand-held Rabbit and DORA devices to track and discipline all Delivery Drivers in California. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Each undelivered package returned at the end of the workday faced scrutiny as Drivers had to select a code on the Rabbit or DORA device to explain the reason for each non-delivered package. Consumer issues were only reported to AMAZON – not to any of the Delivery Service Partners – but were used as a basis for discipline or termination, irrespective of a DSP's assessment. After three incidents, any Delivery Driver with insufficient reasons for

non-deliveries was either terminated by the DSP (who was told by AMAZON management to do so), or were, as happened to Plaintiff Miller, suspended without pay for a period of time as a disciplinary measure.

26.    Further, Delivery Drivers were penalized or subject to reduced work by AMAZON if they missed deliveries, were late, or were stuck in traffic. In other words, uncontrollable events that interfered with AMAZON's program, timeline, and directives resulted in reprisal, reduced work, and discipline and/or termination initiated by AMAZON. In short, AMAZON retained the power to discipline, terminate, and blacklist Delivery Drivers. AMAZON also requires face-to-face "debriefing" (*see* Exhibits 3-4) with Delivery Drivers when certain types of customer codes arise in Rabbit or DORA data.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████. For example, a non-delivered package would have a certain code and trigger an automatic "de-briefing" between AMAZON and the Delivery Driver. "Concessions" also have a code and a certain number of concessions would trigger an automatic "de-briefing" between AMAZON and the Delivery Driver.

27.    AMAZON monitored Plaintiff's and other Class Members' specific tasks, package pick-ups, deliveries, and driving time, down to the second, through the electronic devices it issued to all Delivery Drivers and other applications it used to electronically direct and control all aspects of Driver employment duties. These devices, which AMAZON calls "TC-55," have unique employee-identifiable signatures on software AMAZON calls Rabbit or DORA. These devices record GPS and cellular data, including unpaid time, unpaid overtime, and un-provided or interrupted meal and rest periods.

28.    Delivery Drivers are required to work out of an assigned hub or terminal managed and operated by AMAZON, to which they are required to report to work 10-15 minutes before commencing their daily pick-up and delivery duties. AMAZON determines the daily routes and locations all Delivery Drivers (including Plaintiff and Class Members) are assigned to, as well as the number of deliveries required to be completed each day and

the deadlines for each delivery. Failure to comply with these imposed schedules and deadlines subjects Delivery Drivers to potential disciplinary measures, up to and including termination.

29.   The Delivery Service process is uniform and systematic and is outlined in the AMAZON Delivery Associate Participant Guide that was provided to all Delivery Drivers in California, irrespective of the DSP that jointly employed the Driver. As illustrated below, the Delivery Associate Participant Guide directly controlled all primary work duties and functions of Delivery Drivers. *See* Exhibits 3 and 4 attached hereto.



8 Keys to a Perfect Delivery - Job Aid

Overview

Concessions cost Amazon hundreds of thousands of dollars each month. Avoiding concessions by following the Keys to Perfect Delivery will make our customers and your managers happy about your performance as a Delivery Associate.

What is a concession?

A concession is a refund, free replacement, or account credit linked to a delivery error.

*Example:*
You deliver a package to Larry's home and leave the package by his front door. You mark in Rabbit – Delivered -- Front Door and continue on your route. Larry gets a text at work telling him his package is waiting for him at home. Larry gets home and there is no package. Larry, then calls Amazon customer care and reports the missing package.

This is considered, Delivered, Not Received (DNR), and reported to your Delivery Service Provider (DSP).

Follow the 8 Keys to a Perfect Delivery
1.   Make sure you are at the correct address: Don't risk a concession
2.   Knock on the door and ring the bell between 8am – 8pm
3.   Deliver to the customer's front door when it is permitted and secure
4.   Scan the package at the point of delivery (not from your vehicle)
5.   When delivering to the customer directly, verify the customer's name
6.   Be courteous and respectful to customers and other carriers
7.   Follow the customer's delivery instructions when secure and safe
8.   Never deliver to a USPS mailbox or Post Office

\*\*\*

FOURTH AMENDED CLASS ACTION COMPLAINT                    CASE NO. 17-CV-03488-MMC

## What are the TC55 and Rabbit?

The TC55 device is the hand-held device and Rabbit is the software that will log your mileage, keep track of the status of every one of your packages, and navigate for you throughout your route.

### *Example:*

Suppose you have 120 packages to deliver on your route. Rather than giving you a list of packages and addresses your Dispatcher will give you a TC55 with Rabbit installed on it.

The device will:

- Tell you how to get to your first stop and which packages get delivered there.
- Keep track of all packages delivered and the reasons that any undelivered packages could not be delivered.

## How will I use the TC55 and Rabbit successfully?

Here are some of the TC55's basic functions:

- Turn on the device

- Open App
  - Tap the **Rabbit App** Icon
  - Tap Sign In with Amazon



***

FOURTH AMENDED CLASS ACTION COMPLAINT                    CASE NO. 17-CV-03488-MMC

> **"Show up 10-15 Minutes Early in <u>Uniform</u> and Clock into TimeForce"**

## The Morning Routine

1.  Show Up 10-15 Minutes Early in <u>Uniform</u> And Clock Into TimeForce

    (Black Shoes & Pants, Amazon Shirt & Jacket, Safety Vest, Badge, We Missed You Cards)

2.  Check in With Dispatch After Morning Huddle

3.  Sign Into DORA, Find Your Route and Proceed Scanning, Report and Missing and/or Missort Packages, Show Dispatch When You're Done

4.  Load Van

5.  After Dispatch Gives the All Clear, You May Start Your Deliveries



## Scanning And Making A Delivery



After You Scan <u>AT THE FRONT DOOR</u>, Select a Delivery Location

**You Can Leave It With:**
*   The Customer On The Box Or Anyone Inside Address
*   A Neighbor
*   The Front Desk, I.E A Receptionist or Leasing Office

**You Can Leave It At:**
*   The Front Door, If Secure
*   The Rear Door, If Secure
*   A Secure Location
*   Digital Lockers

**You May Not Leave It Unattended At:**
*   An Unsecure Location*
*   Apartment Door*
*   Busy Street*
*   USPS Or UPS Store

* Unless Customer Requests It and TOC Instructs You To

FOURTH AMENDED CLASS ACTION COMPLAINT                    CASE NO. 17-CV-03488-MMC

# Concessions

Concessions Are Refunds, Replacements, Or Amazon Credit That Amazon Issues Their
Customers When They Did Not Receive Their Package Or Received A Damaged Package.

These Are What Amazon Are Watching Very Closely And Judge Performance On.

We Also Monitor These Very Closely And Try To Get As

Least As Possible.



\*\*\*

# Debriefing With Amazonians

1.  Bring Your Debriefed DORA
2.  Have Them Scan Your Returns
3.  Keep DORA



13

30.     As noted, AMAZON requires the Delivery Drivers to follow specific guidelines for every detailed step of their work, which in actual practice results in numerous California Labor Code violations. Delivery Drivers must report to assigned AMAZON hubs or warehouses 10-15 minutes before their shifts, where they are required to complete pre-delivery duties before commencing their daily deliveries. Then, AMAZON requires Delivery Drivers to deliver each package within a specific window of time, dictated by AMAZON. Delivery Drivers must also adhere to AMAZON's company policies and procedures, such as those related to customer service and interaction; background and criminal history qualifications; honesty standards; driving and delivery standards; work uniforms and personal appearance; drug, alcohol, and tobacco use; workplace harassment; weapons and dangerous materials; progressive discipline; and concessions (undelivered packages, damaged packages, lost and stolen packages, etc.), among others. And, all Delivery Drivers must meet AMAZON's safety and training requirements. Moreover, AMAZON requires Delivery Drivers to comply with strict uniform requirements, which includes, among other items, a company shirt affixed with the Amazon logo, an Amazon hat, black pants, black shoes, and a bright colored safety vest. Delivery Drivers are also required to drive vehicles affixed with an Amazon logo decal for pick-up and delivery services. Finally, AMAZON has the power to train, discipline, and fire Delivery Drivers (or terminate their contracts or deactivate a particular Delivery Driver from access to Amazon facilities). Indeed, Plaintiff Miller and other Delivery Drivers dealt with AMAZON supervisorial employees on a regular basis and routinely had to comply with their orders and directions, including those relating to, *inter alia*, the amount of time allotted for pickups and deliveries, concessions, and pre-delivery duties.

31.     During Plaintiff Miller's employment, she was suspended by AMAZON for concessions due to package delivery issues, evidencing AMAZON's control of employee discipline and termination. *See* Exhibit 5 attached hereto and expressly incorporated herein by this reference (relevant excerpts below).

**Subject: Concession Info**

Hello Jasmine,

I've attached a review of your concessions. They state the TBA number, where it was delivered, and what the address was. You have a total of **9**.

As I've mentioned before, delivering in Fremont and Union City has a higher concession chance than anywhere else. A high concession count is not sustainable for any DA of any company for the Amazon Project.

> **"A high concession count is not sustainable <u>for any DA of any company</u> for the Amazon Project"**

\*\*\*

**From:** Richard Mendoza <richard@1-800courier.com>
**Date:** July 6, 2016 at 7:49:37 PM PDT
**To:** hrteam@1-800couriercom.zendesk.com
**Cc:** Jeff Hicks <jeff.hicks@1-800courier.com>, Gabor Tolnay <gabor@1-800courier.com>, Christian Rivera <christian@1-800courier.com>
**Subject: @suspension AZSL200**

Hello Jasmine,

There has been a suspension submitted to you about your work performance. Initially, you were fast enough to finish your own routes. Lately, you have slowed down past anyone else and dispatch has noticed it almost everyday you work. This has created great strains of frustration between 1-800Courier and Amazon. Per policy, you have been suspended due to performance issues.

Your suspension starts tomorrow and will end Saturday, the 9th of July. I have attached the document for review.

Thank you,

\*\*\*

**Employee Disciplinary Action Form**

Employee Name: Jasmine Jamila Miller _____   Driver #: AZSL200  Today's Date: 7/6/16

Manager Name: Richard Mendoza _____   Manager Job Title: Assistant Station Manager

**Type of Problem/Infraction**

☐Tardiness   ☐Absenteeism   ☐Attitude/Professionalism   ☐Safety/Carelessness   ☒Work Quality

☐Presentation ☐Work Quantity   ☐Delivery Error   ☐Other:_____

Date of actual occurrence:_____

**Type of Disciplinary Action Being Enforced**

☐Coach and Counsel   ☐Verbal Warning   ☐Written Warning   ☐Final Written Warning

☒Suspension:Time frame for suspension: 7/7-7/9 _____

☐Termination

**Details of Reported Incident**

DA is experienced and has been reported delivering less than half of her packages in 7 hours. Dispatch has reported DA has slowed down recently every shift
since Amazon management makes every DA of every company stay out for 10 hours.

**Expectations for Improvement**

Amazon and 1-800Courier expect DA to stop sandbagging after her suspension

**"Amazon management makes <u>every DA of every company</u> stay out for 10 hours"**

32.    AMAZON trains all Delivery Drivers through its uniform training/orientation program. AMAZON requires that all Drivers attend company meetings, including meetings regarding additional training (i.e., training for updated mobile delivery software systems, safety, time efficiency, accident prevention, concessions, etc.), and requires Class

16

Members to take sample route tests and map tests to prove that they know how to look up and travel to all addresses in their designated service areas. Indeed, AMAZON proudly claims that *its* Delivery Drivers are highly trained.

33.    AMAZON provides Delivery Drivers with the tools necessary to perform their work-related duties, including, but not limited to: distribution hubs, terminals, and/or warehouses to work out of; handheld scanners preloaded with package and customer information; certain work uniform-related items (i.e., Amazon company shirts and hats); delivery management system software, GPS tools, turn by turn directions; route and delivery schedules; customer payment systems; shipping package options; and other resources. Through the use of AMAZON logos, the delivery vehicles were represented to the public as AMAZON vehicles.

34.    Through the Delivery Associate Participant Guide, AMAZON exerts comprehensive control over Delivery Drivers. *See* Exhibit 3. Page 3 of the 22-page Guide reveals that Delivery Drivers are required to take a course on AMAZON's policies and procedures. Page 4 of the Guide shows that Delivery Drivers must begin and end their work days on AMAZON's premises, and that AMAZON has instituted safety procedures which each Driver must follow. The Guide provides that Deliver Drivers must wear reflective safety vests provided by AMAZON and that AMAZON will provide lanyards which must be worn at all times during the workday. On page 5 of the Guide, Deliver Drivers are given instructions on how to lift packages. Delivery Drivers are also directed on how to contact customers and are instructed to only contact customers with AMAZON-provided devices (the TC-55). Further, Delivery Drivers are instructed on how to record delivery attempts on AMAZON-provided software. *See* DAPG Ex. 3, at 7). Every Driver is required to use the TC-55 device, which is "a vital piece of equipment." (Ex. 3, at 9). Drivers are instructed to scan each package with the TC-55 device at time of delivery (further enhancing the verifiability of working off the clock or when preventing meal or rest periods by electronic means).  The Rabbit software which is installed in the TC-55 "will log your mileage, keep track of the status of every one of your packages, and

1 navigate for you throughout your route."  Page 9.  In fact: "the device will tell you how to
2 get to your first stop and which packages get delivered there." *Id*.

3      35. ████████████████████████████████████████████
4 ████████████████████████████████████████████████████████████
5 ████████████████████████████████████████████████████████████
6 ████████████████████████████████████████████████████████████
7 ████████████████████████████████████████████████████████████
8 ████████████████████████████████████████████████████████████
9 ████████████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████████████
11 ████████████████████████████████████████

12      36. ████████████████████████████████████████████
13 ████████████████████████████████████████████████████████████
14 ████████████████████████████████████████████████████████████
15 ████████████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████████████
17 ████████████████████████████████████████████████████████████
18 ████████████████████████████████████████████████████████████
19 ████████████████████████████████████████████████████████████
20 ████████████████████████████████████████████████████████████
21 ████████████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████████████
23 ███████████████████████████████████

24      37.    AMAZON provides customer applications (not accessible by the Delivery
25 Drivers or their DSP) that allow expectant delivery customers to track the exact location
26 and the approximate estimated time of package delivery in real-time based on DORA or
27 Rabbit data. ████████████████████████████████████████████
28 ████████████████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████  AMAZON then directs and instructs exactly the course of

4  action to take in order to prevent customer concessions.

5       38.  ████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  █████████████████████████████████

12       39.  ████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ███████████

18       40.  This degree of control over the Drivers' entire workday falls squarely within

19  the Wage Order's definition of controlling working conditions such that AMAZON is a

20  joint employer subject to complying with Labor Code requirements regarding payment for

21  all work performed and providing compliant meal and rest periods.

22  **Failure to Provide Lawful Off-Duty Meal and Rest Periods, as well as Premium Pay**

23  **for Denied Lawful Meal and Rest Periods**

24       41.  As a result of the AMAZON enforced "metrics," the class of Delivery Drivers

25  were routinely deprived of protection of the California Labor Code Sections 226.7 and

26  512. AMAZON's standardized routes and package volume resulted in Plaintiff and the

27  proposed Class to be routinely denied unpaid off-duty thirty-minute meal periods within

28  the first five hours of work for shifts lasting more than six hours, and/or second off-duty

meal periods for shifts lasting ten or more hours in a single workday. AMAZON's standardized controls, routes, and performance requirements also caused Plaintiff and Class Members to be deprived and/or discouraged from the ability to take lawful paid off-duty ten-minute rest periods for every four hours worked, or major fraction thereof, for shifts lasting more than three and one-half hours in a single workday.  Missing delivery schedules and AMAZON performance requirements resulted in reprimand or deactivation from access to AMAZON stations, and as a result, delivery associate participants could not take breaks for fear of termination for failure to deliver the ever-increasing volume of package delivery requirements for each AMAZON designated route.

42.     Specifically, AMAZON's control routinely denied Plaintiff and Class Members the ability to be provided mandated lawful uninterrupted meal and rest periods by, *inter alia*, scheduling them for numerous time-consuming deliveries and lengthy delivery routes that prevented them from completing their daily deliveries if uninterrupted off-duty meal and rest periods were taken. Because Plaintiff and Class Members were required to complete all daily pickups, deliveries, and other work-related duties before ending their shifts, they typically had no time to take lawful uninterrupted meal and rest periods if they were to complete their required duties. If Plaintiff or Class Members ever failed to complete all work-related duties (including deliveries), they would be subject to potential disciplinary measures, up to and including termination, contract cancellation, and/or non-renewal of contracts. Even when Plaintiff and Class Members were provided some form of meal and/or rest periods during the Class Period, those periods were typically "on duty," subject to management control and continuance of work-related duties.

43.     The willfulness of AMAZON's DSP stratagem failing to provide mandatory meal and rest periods is evidenced in the scheduling software which controls where and when employees will deliver packages. While it is clear that the software controls routes and times, no meal or rest periods were programmed into the software or into any employee's route each day. Plaintiff alleges further that AMAZON intentionally used staffing companies so that AMAZON could avoid liability for compliance with California

law requiring such meal and rest periods, even though AMAZON controls every portion, *and every minute*, of each employee's day.

44.     During the two-to-three training period days in April 2016, the trainer would advise as to all AMAZON procedures, protocols, policies, and job duties.  During that time, Plaintiff Miller took a lunch, but the entire scope of the job, efficiency, use of the Rabbit hand-held and other work-related information was provided (i.e., delivering to apartments with security codes, etc.). Thus, this was work time subject to AMAZON control and not a compliant meal period.  Even during training there was no policy for rest periods for 10 minutes for approximately every 4 hours worked. Under AMAZON's delivery model, meal and rest periods compliant with California law are non-existent and there is no policy providing for them, nor was there a policy to pay "premiums" of one hour of pay for non-compliant meal periods or rest periods in violation of Wage Order 9, Section 11-12 and Labor Code sections 226.7 and 512. Specifically, Plaintiff Miller and other drivers were always on duty, could not turn off their cell phone or Rabbit device, and were subject to discipline or criticism if the GPS device mounted on the truck indicated non-movement for any period of time over 20-25 minutes. Plaintiff Miller was called on multiple occasions on her personal cell phone to explain any perceived delays. This active mode of forcing deliveries when a truck was not moving on a GPS monitor, was later called "sandbagging" to suggest the driver was not meeting delivery performance requirements of AMAZON.

45.     Electronic records will show that AMAZON's policies and practices resulted in systematic denial of proper meal and rest periods. Employees were not relieved of all duties, were not even advised as to when or how they were to take break periods, could not turn off key electronic devices (thus continually subject to employer control, whether exercised or not), and in fact were specifically discouraged from taking breaks in order fulfill delivery obligations. Failure to comply with delivery obligations, proper coding, and documentation was a basis for AMAZON to discipline and terminate employees, even if the subcontracting joint employer did not agree.

46.     For each day Plaintiff worked for AMAZON, she alleges and will testify that no compliant meal or rest periods were provided and no one hour of pay was provided at her regular rate of pay from April 2016 until her termination by AMAZON on or about July 28, 2016.  Under AMAZON's "minimum performance standards" there was no such thing as a break period that the driver was "relieved of all work duties."  Further, ███████ ███████████████████████████████████████████████, DSP's had no room in their compensation budget to pay for lawful break period where delivery drivers were timely provided with meal or rest periods "relieved of all duty" ████████████████████ ███████████████████████████████████████, nothing was provided to DSP's to be able to provide one hour "premiums" under California law for non-compliant breaks.  The result of █████████████████████████████████ was never to take into account the payment of California premiums for violating meal and rest period laws.  Let this be clear: as a result of AMAZON standard operations and policies, California DSP's not only could not provide breaks, ████ ██████████ ████████████ ██████████ ████ ██████ ████████████████████ failed to ever account for the possibility of a non-compliant break and the one-hour pay premium requirement under California law.

47.     Many Delivery Drivers, in order to meet delivery requirements literally urinated in plastic bottles in order to avoid stopping for a bathroom break. *See* Ex. 2, Business Insider Article, *Amazon is launching a new delivery program and hiring thousands of drivers, with a warning against 'peeing in bottles'*. Plaintiff herself was and did take both her hand-held Rabbit device and cell phone into any restroom she could find so as not to be unavailable to AMAZON customers, dispatchers, or managers seeking information about any particular delivery during her employment.  And Plaintiff, while in a restroom, was required to take all calls or messages, or immediately (within less than 5 minutes) call back if she missed a call, email, text or inquiry on either the Rabbit, or her personal cell phone as it related to AMAZON's delivery.

48.     AMAZON's contracts with DSPs are substantially and materially identical and allow AMAZON to directly control Delivery Drivers. Other than the various names of

the DSPs, investigation indicates, and discovery will confirm, that AMAZON controlled each of its DSPs in the same, uniform manner, and controlled each DSP's Delivery Drivers in the same manner. AMAZON's conduct with respect to its DSPs and Delivery Drivers is systematic and continuous, and DSPs, who are faced with increased delivery volume and requirements, could not possibly pay all wages and comply with California's labor wages and hours minimum standards.

49.     Throughout the Class Period, AMAZON's practices resulted in the systematic failure to provide compliant meal periods, triggering an obligation to pay premium pay at the rate of one hour of their regular pay rates for each workday they were denied off-duty unpaid thirty-minute meal periods. Likewise, AMAZON's practices resulted in the systematic failure to provide Plaintiff and Class Members proper premium pay at the rate of one hour of their regular pay rates for each workday they were denied lawful, uninterrupted paid rest periods. No premium pay was provided even though the software applications showed that activity was present during time that such rest periods were to be provided. AMAZON's electronic records will show that the employees were engaged in work activities in order to comply with delivery demands during times that off-duty meal and rest periods were to be provided. Any of the Delivery Drivers who skipped meal and rest periods did so under duress for fear that AMAZON would restrict future driver assignments as a result of missed or late deliveries. There was at no time a voluntary waiver of rest periods by Plaintiff or members of the proposed Class; rather the Delivery Drivers were required to continue working under the systematic and draconian production practices of AMAZON to meet delivery quotas. AMAZON's willfulness in avoiding Labor Code requirements is evident in the lack of any way to record a missed meal or rest break in the Rabbit software employees are required to use.

## Failure to Pay Regular Pay Regular Pay/Minimum Wages and Overtime Pay

50.     During the Class Period, AMAZON's herein-described practices routinely resulted in the failure to compensate Class Members adequately for mandatory minimum wages under federal and state law—for regular hours worked. For example, Plaintiff was

not paid for at least 3-4 hours of work during the first few weeks of work because AMAZON deemed her delivery times inadequate.

51.     Specifically, AMAZON's control denied Plaintiff and Class Members regular pay/minimum wages for hours worked by requiring them to work extended hours in order to complete their job duties—including pickups and deliveries, as well as completing paperwork—but only compensating them for a set number of hours. For example, Plaintiff Miller estimates unpaid time was between 3.5 hours in a day (usually for new hires) to 1-3 hours per week for employees who continued delivery efforts but were not paid for additional efforts. In addition, class members spent about 20 minutes in the morning hours before initializing the standardized Rabbit software on the handheld scanner device provided by AMAZON and another 5-10 minutes to return the "Amazon" labeled vehicle from the terminal to a parking area nearby.

52.     AMAZON required Delivery Drivers to work approximately ten or more hours per day, including overtime hours, and required that they complete all pickups, deliveries, and other work-related duties before being permitted to end the workday. AMAZON determined the number of daily deliveries Delivery Drivers were required to complete, which often could not be done in a regular eight-hour workday. If Plaintiff and Class Members did not complete their assigned daily duties, they would be subject to potential disciplinary measures, up to and including termination. As such, Plaintiff and Class Members would often be required to work several hours a day with no compensation at all during the Class Period.  This is because Plaintiff and Class Members were required to clock out at the end of their scheduled hours, and then continue delivering the packages on their route that day.  AMAZON's Rabbit software, when compared to AMAZON's TimeForce records, will demonstrate that Plaintiff and Class Members were delivering packages after they had clocked out for the day, at AMAZON's instruction. This comparison is easily performed on a class-wide basis without resort to inquiring each Class Member's memory, from AMAZON's electronic business records.

53.     In addition to regular pay/minimum wages, AMAZON's standardized

policies, practices and procedures resulted in Plaintiff and Class Members failure to receive applicable overtime premium compensation for hours worked in excess of eight hours per day, forty hours per week, and/or hours worked on the seventh consecutive day in a work week. During the Class Period, AMAZON typically required Delivery Drivers to work overtime hours, yet often did not compensate them for all overtime hours worked, let alone proper overtime premium compensation. Indeed, despite regularly working more than eight hours in a workday and/or forty hours in a workweek, Plaintiff was regularly denied overtime premium compensation for overtime hours worked during the Class Period.

54.   Plaintiff Miller began employment with AMAZON in April 2016. On a typical day, she would arrive to work at 8:00 a.m., clock in on her personal smartphone using the TimeForce application as required, have a short meeting, and then arrive at the AMAZON terminal at about 8:20 a.m. to receive her delivery instructions from AMAZON and load her vehicle using her handheld Rabbit device. The Rabbit could only be initiated by AMAZON managers who would load each and every package delivery and order of delivery, and routing. Once the Rabbit was initiated, it could not be turned off or put in any mode to prevent contact – thus all work time was on duty and subject to employer control. Further, in order to deliver packages, no breaks were possible, which was a direct result of AMAZON's insistence that the Driver be available immediately in the event of customer or delivery issues. The Rabbit logged all time from approximately 8:20 a.m. every morning (when initiated at the Amazon terminal) and stayed on until any packages undeliverable were tagged and logged back at the Amazon terminal.  Then, 5-10 minutes later, Plaintiff Miller would return and lock her vehicle and clock out of TimeForce application.

55.   Comparison of ███████████████████████ will show substantial underpaid work time for her and all Class Members as compared to purposed punch-clock time on the smartphone application on the employees' personal cell phones. Data analytics will show that between GPS data on each truck, Rabbit package delivery confirmation codes, and punch clock data, AMAZON failed to pay considerable wages to the proposed

Class as to hours paid versus total hours worked.

56.     For example, during Plaintiff Miller's first week, she did not clock out of work on her application until around 9:30 to 9:45 p.m. every night.  However, she was only paid as if she clocked out at 7:00 p.m. For the first two weeks of employment, Plaintiff Miller worked without pay for about 3.5 hour per day, without overtime or minimum wages. Plaintiff is informed and believes that this practice to short the clock was systematic and done as a way to force increased productivity and parcel delivery rates.

57.     Plaintiff Miller estimates that each route AMAZON assigned required delivery of up to 150 packages per day. The lowest amount she recalls was 85. The highest amount was over 200. Once a package delivery was entered into the Rabbit device, the Rabbit would update the route for the Driver's next delivery. Shifts with fewer assigned packages tended to be difficult deliveries (i.e. gated complexes). On days when she was assigned 85-90 packages, Plaintiff was sent to assist other Drivers with their deliveries once she completed hers (a supervisor would call Plaintiff on her personal cellphone and direct her to help other Delivery Drivers).

58.     After Plaintiff Miller's first two weeks of employment, she recognized that AMAZON was not paying her for all hours worked. Therefore, Plaintiff returned to the terminal several times at or around 7:00 p.m., since the hours from 8:00 a.m. to 7:00 p.m. were the only ones that she would be paid; otherwise, her clock time would be modified. Miller continued to deliver packages after 7:00 p.m. after her first two weeks of working (and was not paid either minimum or overtime wages), but she estimates that the amount of weekly wages unpaid was about 2-3 hours per workweek.

59.     AMAZON, based on its standardized policies, practices and procedures related to the DSP program qualifies it as a Joint Employer of Delivery Drivers, and renders it liable for unpaid regular and overtime wages. The shortfall, and premium wages, owed, can be proven by investigating AMAZON's timekeeping and delivery-tracking software.

### Failure to Reimburse for Necessary Expenditures Incurred

60.   AMAZON, as a joint employer, was responsible for reimbursement for necessary expenditures incurred as a direct consequence and requirement of performing their job duties, including, but not limited to, work uniform-related items and necessary tools and supplies.

61.   Plaintiff and other Delivery Drivers were required to, and did, personally pay for numerous expenses that were necessary for their performance of work-related duties. Plaintiff and Class Members were also required to carry and use their personal cell phones for scheduling purposes and to maintain communication with dispatchers and the warehouse—all without any reimbursement of any kind.   Other necessary expenditures were incurred for parking, parking citations, tolls and other incidental but necessary expenditures incurred and directly related.   The nature and extent of such expenditures were common to the proposed Class Members, but no reimbursement was provided.

62.   Specifically, in order to clock-in to the TimeForce application and record her hours worked, Plaintiff was required to use a personal smartphone application. During her employment, Plaintiff Miller paid approximately $100 per month for a smartphone with a data plan. In a typical week, Plaintiff Miller estimates using her personal cell phone 3 out of the 5 days she worked due to the Rabbit devise not working (i.e. glitches, battery, reception). Plaintiff estimates that all Delivery Drivers were required to use their personal smartphones daily and receive and check emails or text messages daily, such that up to 75% of all smartphone use was necessary for business use. Yet, there was no policy for reimbursement and no reimbursement was offered at all. Plaintiff estimates that most Class Members with a cell phone and data plan spent a similar amount of money per month to be a Delivery Driver for AMAZON and that each is owed approximately $75 per month during the proposed Class Period.

63.   Customers of AMAZON and the Amazon Logistics team were able to reach Delivery Drivers on the Rabbit device, but AMAZON managers and DSP supervisors routinely called and texted Delivery Drivers on their personal cell phones if they could not

be reached on the Rabbit. In areas where the Rabbit had no reception, in order to complete deliveries, Drivers, including Plaintiff Miller, had to take photos of the packages on their personal smartphones and provide the pictures to AMAZON to confirm delivery. It was also necessary to use a personal smartphone GPS when the Rabbit or DORA were out of range or was unable to provide accurate routing information. Plaintiff observed that many Delivery Drivers were systematically and uniformly required to carry their personal cell phones to complete their delivery routes.

## CLASS ALLEGATIONS

64.     Plaintiff brings this class action on behalf of herself and all Members of the Class ("Class"), initially defined under F.R.C.P. Rule 23(b)(3) and/or Rule 23(b)(2) as follows:

> **Class**:  All current and/or former hourly (non-exempt) persons in the State of California, who worked as an AMAZON Delivery Associate Participant ("DAP" or "Delivery Driver") any time from four years prior to the date of the commencement of this action until the date notice is disseminated (the proposed "Class Period") and were assigned to deliver local warehouse goods.

65.     Plaintiff reserves the right to amend or modify the Class definition as deemed necessary and appropriate based on discovery and may seek certification pursuant to Fed. R. Civ. P. Rule 23(b)(2) and/or Fed. R .Civ. P. Rule 23 (b)(3).

66.     Plaintiff, at the time of certification, will seek an order bifurcating the liability class issues with damage class issues, for judicial economy and efficiency and for the efficiency of the parties, all of whom would have tremendous efficiencies if some, all or none of the liability issues for the proposed Class are determined adversely to the other party, Plaintiff or Defendants.

67.     Plaintiff reserves the right to amend, alter and modify the proposed Class definitions in a manner that conforms to proof.  Plaintiff reserves the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

68.     This action is being brought as a class action pursuant to Fed. R. Civ. P. Rules

23(b)(2) and/or (b)(3). As discussed below, the requirements of Rule 23(a) are satisfied because the class is so numerous that joinder of individual class members is impracticable, common issues predominate, Plaintiff's claims are typical of the class members that she seeks to represent, and Plaintiff and her counsel are adequate to represent the Class. Further, the requirements of Rule 23(b)(3) are satisfied because common issues predominate and the Class Members' claims are subject to common proof. A class action is also the superior method for resolving all of the Class Members' claims of common injuries.

**Specific Allegations as to Class Wide Commonality**

69.    AMAZON required all California-based Delivery Drivers to undergo the same training and orientation related to Amazon policies, processes and procedures, including the use of precise delivery codes, AMAZON delivery applications and devices, orientation videos and materials, AMAZON's product/delivery concession grading, and an "activation/deactivation" process in order for any Driver to access any Amazon facility. This was a uniform and systematic control practice for all Delivery Drivers in the State of California, irrespective of the sub-contracting company or DSP for which the Driver worked.

70.    AMAZON required all California-based Delivery Drivers to undergo an identical and systematic background review process before being "activated" and allowed access to AMAZON stations and deliver AMAZON products. █████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████. Thus, Plaintiff alleges that during the proposed Class Period, AMAZON held the direct power to hire any Delivery Driver in the State of California.

71.    AMAZON required and retained all security background data for each California-based Delivery Driver and issued each Driver his or her own unique individual employee identification number. AMAZON required routine updates from Drivers as to

any information involving tickets, criminal activity, misdemeanors or DUI's. ██████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████   ██████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████   ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████

72.     AMAZON required all California-based Delivery Drivers to fully comply with all dispatch instructions exactly as determined and dictated by AMAZON or else be subject to reprimand or "debriefing" by AMAZON.

73.     AMAZON required all California-based Delivery Drivers to maintain an optimal level of customer satisfaction and to minimize package returns (non-deliveries), which AMAZON monitored in a systematic and uniform way. AMAZON also monitored each Delivery Driver's "concessions" (i.e. wherein a package was either not delivered, or a package was delivered but either not received or was delivered to an incorrect address). AMAZON's concession policy was consistent throughout California and if a Driver reached a certain level or number of concessions, as determined by AMAZON, the Driver would be required to submit to re-training and orientation. █████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████

74.     ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█ ██████ ████ ███ ██ ██████ ████ ████ █████ ██ ████ █████ ██████

████████████████████████████████████████████████████████████████████████████

██████████████   irrespective of the actual time and cost for compliance with the

package volume delivery issues related traffic congestion, or issues with being able to securely deliver packages.

75. ███████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████     ███████████
█████████████████████████████████████████████████████
███████████████████████████████████.

76. AMAZON used the same or a substantially similar scheme of having DSP "dispatchers" physically sit side-by-side with AMAZON customer service dispatchers, or at least be directed by AMAZON customer service dispatchers regarding customer concerns, delivery issues, missing packages, etc. So, while DSPs and Delivery Drivers did not intake direct customer calls regarding package delivery issues, AMAZON directed, verbatim, exactly how a Delivery Driver was to respond to any given delivery issue scenario. In fact, AMAZON trains on all of the most common delivery scenarios and provides direct scripting, word-for-word, to the Delivery Drivers, in order to address and succinctly code the situation into its delivery software application. This is done by AMAZON in order to avoid potential job-threatening customer "concessions."

77. AMAZON required all California-based Delivery Drivers to review and monitor their delivery application (now known as Rabbit) for each daily shift in order to determine if there was a delivery instruction or request from an AMAZON customer. This requirement to be always available was based on AMAZON directives, adopted by DSPs, and rendered all such Delivery Drivers as "always on duty" or always subject to AMAZON's control, thus frustrating the purposes of California's meal and rest period

laws and corresponding regulations.   AMAZON's zeal for control and for avoiding customer concessions or complaints overrode any and all concerns about whether California-based Delivery Drivers were provided lawful and compliant meal and rest periods in accordance with Labor Code §§ 226.7, 512(a) and IWC Wage Order 4-2001, §§ 11-12.

78.   AMAZON maintained, and continues to maintain, a uniform and systematic means of offering DSPs "business opportunities" to be eligible service AMAZON delivery routes. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████, and the DSP agreements are substantially identical in all material terms and offered to the DSP's on a "take it or leave it" basis.  So even though AMAZON controls package volume, ████████, the delivery mode and means, customer concessions, ████████████████, for any particular day that uncontrollable events occur (i.e. traffic accident, in-climate weather, delivery locations that have no visible address, etc.), the DSP receives the same compensation, irrespective of whether the compensation is sufficient to comply with California wage and hour laws for the Delivery Drivers. This is a common policy and practice that not only subjects AMAZON to liability as a Joint Employer, but is also a common theme that is occurring throughout the State of California.

79.   AMAZON provided all California-based Delivery Drivers with AMAZON's "Delivery Associate Participant Guide" and required that all Delivery Drivers follow AMAZON's specific delivery policies and procedures, down to every detail as shown by the Delivery Associate Participant Guide. The Delivery Associate Participant Guide required that all Delivery Drivers wear a specific uniform (i.e. black shoes and pants, AMAZON shirt and jacket, safety vest, and a badge) and wear a specific uniform (i.e. black shoes and pants, amazon shirt and jacket, safety vest, and a badge); wear keychain lanyards, which had to be attached to the vehicles keys at all times, as part of the uniform standard; take with them and utilize Amazon's "We Missed You" cards when leaving

packages for customers; and take with them and utilize Amazon's "Delivery Attempt Labels" when unable to deliver packages for customers. Through the provisions of the Delivery Associate Participant Guide given to all Delivery Drivers with the requirement that all Drivers follow the provisions provided therein, AMAZON had the ability to directly control every aspect of the working conditions of Delivery Drivers.

80.    AMAZON required that all Delivery Drivers use the TC-55 device during every step of delivering a package. For example, AMAZON required that all Delivery Drivers scan each package with the TC-55 device, select on the TC-55 device where the Driver left a package or select a reason for not delivering the package, and use the TC-55 navigation feature for each delivery. AMAZON received and tracked the data entered into the TC-55 device by Delivery Drivers, which permitted AMAZON to track every aspect of the Delivery Drivers' work, including details of all packages delivered and the Drivers' detailed route and mileage.

81.    Accordingly, this action may be brought as a class action because common questions of law and fact predominate over any issues solely affecting the individual Plaintiff or Class Members, including, but not limited to:

i.    Whether, based upon AMAZON's direction and control of Delivery Drivers, AMAZON became a joint employer under California law;

ii.    Whether AMAZON's Rabbit and DORA tracking data will evidence control;

iii.    Whether AMAZON's standardized practices violated the California Labor Code and applicable Wage Order by failing to compensate Plaintiff and Class Members mandated minimum wages and/or regular pay for regular hours worked;

iv.    Whether AMAZON is liable for damages, interest, restitution, statutory penalties, attorneys' fees, and/or costs for failing to compensate Plaintiff and Class Members mandated minimum wages and/or regular pay;

v.    Whether AMAZON's standardized practices violated the California Labor Code and applicable Wage Order by failing to properly compensate Plaintiff and Class Members mandated overtime premium pay for hours worked in excess of eight (8) hours in a workday, forty (40) hours in a workweek, and/or hours worked on the seventh consecutive day in a workweek;

vi.    Whether AMAZON is liable for damages, interest, restitution, statutory penalties, attorneys' fees, and/or costs for failing to properly compensate Plaintiff and Class

33

Members mandated overtime wages;

vii. Whether AMAZON's standardized practices violated the California Labor Code and applicable Wage Order by failing to provide Plaintiff and Class Members lawful thirty (30)-minute uninterrupted meal periods within the first five (5) hours of work in any workday lasting more than six (6) hours, and by failing to compensate Plaintiff and Class Members one hour of premium pay at their regular hourly pay rates for each workday a lawful meal period was not provided;

viii. Whether AMAZON is liable for damages, interest, restitution, statutory penalties, attorneys' fees, and/or costs for failing to compensate Plaintiff and Class Members one hour of premium pay at their regular hourly pay rates for each workday a lawful meal period was not provided;

ix. Whether AMAZON's standardized practices violated the California Labor Code and applicable Wage Order by failing to provide Plaintiff and Class Members lawful ten (10)-minute uninterrupted rest breaks for every four (4) hour period of work in any workday, or major fraction thereof, and by failing to compensate Plaintiff and Class Members one hour of premium pay at their regular hourly pay rates for each workday a lawful rest period was not provided;

x. Whether AMAZON is liable for damages, interest, restitution, statutory penalties, attorneys' fees, and/or costs for failing to compensate Plaintiff and Class Members one hour of premium pay at their regular hourly pay rates for each workday a lawful rest period was not provided;

xi. Whether AMAZON's standardized practices violated the California Labor Code and applicable Wage Order by failing to keep accurate payroll records concerning Plaintiff and Class Members;

xii. Whether AMAZON is liable for statutory penalties for failing to keep accurate payroll records concerning Plaintiff and Class Members;

xiii. Whether AMAZON's standardized practices violated the California Labor Code and applicable Wage Order by failing to indemnify/reimburse Plaintiff and Class Members for necessary expenditures incurred while discharging their duties and/or obeying the direction of their employer;

xiv. Whether AMAZON's standardized practices violated California Business and Professions Code §§ 17200, *et seq.* by engaging in unfair, unlawful, and/or fraudulent business practices.

xv. Whether as a matter of California common law the Delivery Drivers are deemed "jointly employed" by AMAZON such that certification of the common question is appropriate under F.R.C.P. Rule 23(b)(2) and/or Rule 23(b)(3).

34

**Numerosity**

82.     The proposed Class consists of likely over 1,000 persons who worked as AMAZON Delivery Associate Participants during the Class Period. The members of the Class are so numerous that joinder of each Class Member is impracticable, if not impossible. As such, a class action is the only available method for the fair and efficient adjudication of this controversy.

**Ascertainability**

83.     Class Members can easily be identified by AMAZON's unique assigned Delivery Driver identification number that was assigned to each Delivery Driver, irrespective of the identity of the DSP.

**Typicality**

84.     Plaintiff's claims are typical of the claims of each Class Member in that all claims result from AMAZON's uniform application of unlawful employment practices, as alleged herein. Moreover, Plaintiff's claims are typical of the claims of each Class Member because each have sustained damages arising out of, and caused by, AMAZON's common course of unlawful conduct, as alleged herein. As such, Plaintiff has the same interest in this matter as all members of the Class, and has no interests antagonistic to the interests of other Class Members.

**Superiority**

85.     This action is brought as a class action because this method is superior for the fair and efficient adjudication of the controversy. The amount of damages suffered by individual Class Members, while not inconsequential, makes individual actions impracticable given the expenses and burdens associated with seeking individual relief, as each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish AMAZON's liability. A class action is the only practicable method by which the Plaintiff and Class Members can achieve redress from AMAZON and prevent AMAZON from unjustly benefitting from their common course of unlawful conduct, as alleged herein. This

action will conclude issues relating to 1,000 Delivery Drivers jointly employed by over 7,000 Delivery Associate Partners. The prosecution of individual actions would present a risk of inconsistent judgments, even though each Class Member has an effectively identical claim of right against AMAZON. Inconsistent judgments could be dispositive to the interests of other Class Members who are not parties to the individual adjudication and/or may substantially impede their ability to adequately protect their interests. If separate actions were brought, or are required to be brought, by individual Class Members, the resulting multiplicity of lawsuits would cause an undue hardship and burden on the parties and the judicial system. In fact, Plaintiff's counsel believes there are over 40 similar lawsuits against AMAZON at this time regarding Delivery Drivers. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of AMAZON's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**Adequacy**

86.   Plaintiff is an adequate representative of the Class. Plaintiff's claims are typical of those of the Class. Plaintiff and Class Members have no unique claims, have no conflicts of interest, and share the same interests in the litigation of this matter. Plaintiff retained competent counsel experienced in employment law and the prosecution of complex class actions, and are committed to the vigorous prosecution of this action. Further, Plaintiff's counsel have the ability and willingness to commit significant resources to the prosecution of this matter. Accordingly, Plaintiff is an adequate representative of the Class, and will fairly and adequately protect the interests of the Class with the help of experienced and knowledgeable retained counsel.

**Manageability**

87.   Plaintiff alleges that the matter is manageable with regard to statistical sampling of data, delivery data, GPS data and punch-clock application data that will and is alleged to show that Class Members were not paid all wages for hours worked, that

compliant off-duty break periods were not provided (nor one hour pay premium in lieu thereof), and that personal smartphone charges were necessary and required for business use for a substantial portion of all work hours and were not reimbursed by Defendants. The uniformity of the business policies, practices and patterns, shown by corporate records, corporate representative testimony and electronic data analysis will demonstrate clear liability to the proposed class and direct, intentional control over all aspects of Delivery Driver work duties and working conditions controlled by AMAZON.

## I.   CAUSES OF ACTION
### First Cause of Action
**Declaratory Relief**

88.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows.

89.      Defendant AMAZON contends as a matter of law that it does not have an employment relationship with Delivery Drivers. AMAZON seeks to exempt itself from responsibility for violations of labor laws against Delivery Drivers, including the Plaintiff and members of the proposed Class.

90.     An actual controversy has arisen and now exists within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202 between the Plaintiff on the one hand, and Defendant AMAZON on the other hand, concerning their respective rights and duties.

91.     The Plaintiff contends that the provisions contained in AMAZON's standard "Delivery Associate Participant Guide" given to all Delivery Drivers, which permits AMAZON to directly control the working conditions of Delivery Drivers, demonstrates that Defendant AMAZON employed the Delivery Drivers, whereas AMAZON disputes Plaintiff's contentions and contends that none of the contract provisions in AMAZON's Delivery Associate Participant Guide creates an employment relationship between it and Delivery Drivers such that an actual controversy exists.

92.     Under the Industrial Welfare Commission ("IWC"), the term "to employ" has three alternative definitions. To employ means "(a) to exercise control over the wages,

FOURTH AMENDED CLASS ACTION COMPLAINT                    CASE NO. 17-CV-03488-MMC

hours, or working conditions, or (b) to suffer to permit to work, or (c) to engage, thereby creating a common law employment relationship." *Martinez v. Combs,* 49 Cal. 4th 35, 64 (May 10, 2010).

93.     Through an express direction between Defendant AMAZON and Delivery Drivers such as Plaintiff, labeled as the "Delivery Associate Participant Guide," Defendant AMAZON clearly directed and controlled the working conditions of Delivery Drivers and can be liable as a joint employer. For example and without limitation, AMAZON controls the method and means of work of Delivery Drivers through its Delivery Associate Participant Guide:

- AMAZON requires that Delivery Service Partners follow AMAZON's specific delivery policies and procedures, down to every detail as shown by the "Delivery Associate Participant Guide";
- The Delivery Associate Participant Guide requires that all Delivery Drivers wear a specific uniform (i.e. black shoes and pants, Amazon shirt and jacket, safety vest, and a badge);
- The Delivery Associate Participant Guide requires that all Delivery Drivers wear keychain lanyards, which must be attached to the vehicles keys at all times, as part of the uniform standard;
- The Delivery Associate Participant Guide requires that all Delivery Drivers take with them and utilize Amazon's "We Missed You" cards when leaving packages for customers;
- The Delivery Associate Participant Guide requires that all Delivery Drivers take with them and utilize Amazon's "Delivery Attempt Labels" when unable to deliver packages for customers;
- The Delivery Associate Participant Guide requires that all Delivery Drivers use the TC-55 device during every step of delivering a package;
- The Delivery Associate Participant Guide requires that all Delivery Drivers scan each package using the TC-55 device; select where the Driver left the package; or select a reason for not delivering the package. ████████
████████████████████████████████████████████
████████████████████
- The Delivery Associate Participant Guide requires that all Delivery Drivers use the TC-55 navigation feature for each delivery. ████████████
████████████████████████████████████

FOURTH AMENDED CLASS ACTION COMPLAINT                    CASE NO. 17-CV-03488-MMC

████████████████████████████████████████████
███████████████████████;

- AMAZON provides each Delivery Driver with a specific Delivery Driver employee identifier;
- AMAZON orients all Delivery Drivers with the same AMAZON training; and
- The Delivery Associate Participant Guide provides all Delivery Drivers with a word-for-word script to discuss deliveries with customers.

94.     Further, besides selecting the days chosen for a particular driver to work, all other tasks, processes, and dealings with particular delivery circumstances were and are literally "scripted" by AMAZON.

95.     By example and without limitation, AMAZON "suffered" or "permitted" Delivery Drivers to work in the following ways:

- AMAZON conducts a background check of each Delivery Driver, and each Delivery Driver must pass Defendant AMAZON's background check before being permitting to work;
- AMAZON has a systematic manner of accepting and approving each Delivery Driver (i.e. all Delivery Drivers must satisfy AMAZON's "Minimum Delivery Personnel Requirements" in order to work as a Delivery Driver).
- ████████████████████████████████████████████ ███████████████████████
- AMAZON can require a Delivery Service Partner (DSP) to terminate a Delivery Driver for having too many customer concessions (mis-deliveries or delivery issues for packages, package theft or package return); and
- AMAZON can require a Delivery Service Partner (DSP) to terminate a Delivery Driver if the Driver's background information changes (i.e., tickets, DUI, suspected theft, etc.).

96.     While Defendant AMAZON has the ability to directly control the working conditions of DSP Delivery Drivers through the provisions in its Delivery Associate Participant Guide given to all Delivery Drivers, Defendant AMAZON seeks to avoid liability by claiming it does not have an employment relationship with Delivery Drivers and is not responsible for any of the claims made regarding Delivery Drivers.

97.     Plaintiff desires a judicial determination of her rights and duties under the Delivery Associate Participant Guide that Defendant AMAZON entered into with Delivery

39

Drivers. Plaintiff seeks a declaration as to whether or not the Delivery Associate Participant Guide demonstrates an employment relationship between AMAZON and Delivery Drivers such that AMAZON is a Joint Employer of Delivery Drivers. In addition, Plaintiff seeks a declaration that because AMAZON is a joint employer of Delivery Drivers, Defendant AMAZON is jointly liable for the violations of labor laws brought by Plaintiff.

98.    A judicial declaration is necessary and appropriate so that Plaintiff may ascertain her rights and the rights of Class Members regarding the labor violation claims against Defendant AMAZON alleged herein.

**Second Cause of Action**
**Failure to Provide Regular Pay/Minimum Wages**
**Cal. Lab. Code §§ 1194, 1194.2, 1197, 1197.1; Cal. Code Regs. tit. 8, § 11090**

99.    Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows:

100.    California Labor Code section 1194(a) provides:

[A]ny employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum or overtime compensation, including interest thereon, reasonable attorneys' fees and costs of suit.

101.    California Labor Code section 1194.2 provides:

[T]o recover wages because of the payment of a wage less than the minimum wage fixed by an order of the commission or by statute, an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon.

102.    California Labor Code section 1197.1 provides in pertinent part:

(a) Any employer or other person acting either individually or as an officer, agent, or employee of another person, who pays or causes to be paid to any employee a wage less than the minimum fixed by an order of the commission shall be subject to a civil penalty, restitution of wages, and liquidated damages payable to the employee.

40

103. Pursuant to California Labor Code section 1198, the Industrial Welfare Commission ("IWC") provides the maximum hours of work and standard conditions of labor for California employees.

104. Section 4 of IWC Wage Order No. 9-2001 provides in pertinent part:

> (A) Every employer shall pay to each employee wages not less than nine dollars ($9.00) per hour for all hours worked, effective July 1, 2014, and not less than ten dollars ($10.00) per hour for all hours worked, effective January 1, 2016 . . . .

105. Section 2(H) of IWC Wage Order No. 9-2001 defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

106. In general, claims for unpaid regular/minimum and overtime wages must be filed within three years of the date the wages were earned. Cal. Civ. Proc. Code § 338. However, a cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), as alleged herein, extends the statute of limitations by an additional year, effectively giving employees up to four years to file a wage claim in court. *See* Cal. Bus. & Prof. Code § 17208.

107. Plaintiff Miller, as alleged above, was shaved and cut about 3.5 hours per day for her first two weeks of employment with AMAZON. Each workweek thereafter, Miller was working and subject to AMAZON control without pay for an estimated 1-3 hours per week until the end of her employment in late July 2016. Plaintiff will defer to an economic consultant to calculate her wage loss and that of other similarly-situated Class Members, to show losses in an amount according to proof.

108. Plaintiff and Class Members did not enter into legally binding agreements with AMAZON to work for a lesser wage.

109. AMAZON's conduct, as alleged herein, violates the aforementioned regulations because throughout the Class Period, AMAZON's standardized policies, practices and procedures regarding the DSP Program resulted in a failure to compensate Plaintiff and Class Members for all regular hours worked.

110. As alleged in more detail above, AMAZON's standardized policies, procedures regarding the DSP Program resulted in Plaintiff and Class Members being denied regular pay/minimum wages for regular hours worked by, *inter alia*, requiring them to attend unpaid company meetings and training programs, as well as work extended hours in order to complete their mandated job duties, but only compensating them for a set number of hours. ████████████████████████

████, DO NOT COMPENSATE FOR ACTUAL TIME REQUIRED TO DELIVER THE VOLUME OF PACKAGES REQUIRED TO BE DELIVERED.

111. As a direct and proximate result of AMAZON's unlawful acts, as alleged herein, Plaintiff and Class Members have been deprived, and continue to be deprived, of regular pay and mandated minimum wages for regular hours worked in amounts to be determined according to proof.

112. Accordingly, Plaintiff and Class Members are entitled to recover, and hereby seek, the unpaid balance of the full amount of deprived wages, pre- and post-judgment interest, applicable penalties, attorneys' fees, costs of suit, and any further equitable relief this Court may deem just and proper. *See* Cal. Lab. Code §§ 1194, 1197.1; *see also*, Cal. Civ. Proc. Code § 1021.5. Plaintiff and Class Members are also entitled to, and hereby seek, liquidated damages. *See* Cal. Lab. Code §§ 1194.2, 1197.1.

### **Third Cause of Action**
**Failure to Provide Overtime Premium Pay**
**Cal. Lab. Code §§ 1194, 1194.2; Cal. Code Regs. tit. 8, § 11090**

113. Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows:

114. California Labor Code section 1194 provides:

> [A]ny employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum or overtime compensation.

115.   Pursuant to California Labor Code section 1198, the Industrial Welfare Commission provides the maximum hours of work and standard conditions of labor for California employees.

116.   Section 3(A) of IWC Wage Order No. 9-2001 provides in pertinent part:

> . . . employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1 1 /2) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek.

117.   AMAZON conduct, as alleged herein, violates the aforementioned regulations because AMAZON failed to properly compensate Plaintiff and Class Members applicable overtime premium pay for hours worked in excess of eight (8) hours per workday, forty (40) hours per workweek, and/or hours worked on the seventh consecutive day in a workweek.

118.   As alleged in more detail above, AMAZON's policies, practices and procedures related to the DSP Program denied Plaintiff and Class Members proper overtime premium compensation for overtime hours worked by, *inter alia*, requiring them to work extended hours in order to complete their job duties, but only compensating them for a set number of hours.

119.   As a direct and proximate result of AMAZON's unlawful acts, as alleged in detail herein, Plaintiff and Class Members have been deprived, and continue to be deprived, of proper overtime premium pay for overtime hours worked in amounts to be determined according to proof.

120.   Accordingly, Plaintiff and Class Members are entitled to recover, and hereby seek, the unpaid balance of the full amount of deprived overtime premium pay earned for overtime hours worked, pre- and post-judgment interest, applicable penalties, attorneys' fees, costs of suit, and any further equitable relief this Court may deem just and proper. *See* Cal. Lab. Code § 1194; *see also*, Cal. Civ. Proc. Code § 1021.5.

**Fourth Cause of Action**
**Failure to Provide Meal Periods and/or Meal Period Premium Pay**
**Cal. Lab. Code §§ 218.5, 218.6, 226.7, 512, 558.1; Cal. Code Regs. tit. 8, § 11090**

121.   Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows:

122.   California Labor Code section 512 protects meal periods and premium pay.

123.   California Labor Code section 226.7 provides in pertinent part:

> (a) An employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission . . . .

124.   Pursuant to California Labor Code section 558.1:

> (a) Any employer or other person acting on behalf of an employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, may be held liable as the employer for such violation.

> (c) Nothing in this section shall be construed to limit the definition of employer under existing law.

125.   Pursuant to California Labor Code section 1198, the Industrial Welfare Commission provides the maximum hours of work and standard conditions of labor for California employees.

126.   Section 11 of IWC Wage Order No. 9-2001 provides in pertinent part:

> (A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes….

> (B) An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than 30 minutes….

> (C) Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked.

44

. . . .

127.   California Labor Code section 218.5 provides an award of reasonable attorneys' fees and costs to a prevailing employee in any action brought for the non-payment of wages.

128.   California Labor Code section 218.6 provides in pertinent part:

> In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages . . . which shall accrue from the date that the wages were due and payable . . . .

129.   In general, claims for payments under California Labor Code section 226.7 for missed meal and rest period violations must be filed within three years. Cal. Civ. Proc. Code § 338. However, a cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), alleged herein, extends the statute of limitations by an additional year, effectively giving employees up to four years to file a wage claim in court. *See* Cal. Bus. & Prof. Code § 17208.

130.   Premium pay for denied lawful meal and rest periods is considered a "wage" rather than a penalty. *See Murphy*, *supra,* 40 Cal. 4th at p. 1114.

131.   AMAZON's conduct throughout the Class Period, as alleged in more detail herein, violates the aforementioned regulations because AMAZON's standardized policies, practices and procedures related to the DSP Program resulted in the failure to properly provide Plaintiff and Class Members lawful unpaid off-duty thirty-minute meal periods, free from management control, as well as the corresponding required premium pay wages for denied meal periods.

132.   As alleged in more detail above, as a result of AMAZON's standardized policies, practices and procedures related to the DSP Program denied Plaintiff and Class Members lawful off-duty meal periods throughout the Class Period by, *inter alia*, scheduling them for numerous time-consuming deliveries and lengthy delivery routes, and requiring them to complete all daily pick-ups, deliveries, and other work-related duties, which typically left them no time to take lawful uninterrupted meal periods in order to complete their required duties. Even when they were provided meal periods of some form

45

during the Class Period, those periods were typically on-duty, subject to AMAZON management  or dispatch control and continuance of work-related duties.

133.   Plaintiff and Class Members did not enter into legally binding written agreements with AMAZON or any DSP agreeing to "on-duty" meal periods, nor does the nature of their work prevent them from being relieved of all duties during meal periods, as off-duty meal periods could be provided without affecting, damaging, or destroying the performance of their work. To the contrary, any inability to take uninterrupted off-duty meal periods was, and is, attributable solely to AMAZON's own insufficient routing/pricing models, rather than the general nature of the work performed by Delivery Drivers such as Plaintiff and Class Members. Plaintiff is informed and believes, and based thereon alleges, that all Class Members have substantially similar job responsibilities.

134.   Relatedly, despite failing to provide Plaintiff and Class Members lawful uninterrupted off-duty meal periods throughout the Class Period, AMAZON's standardized policies, practices and procedures related to the DSP Program systematically denied Plaintiff and Class Members proper premium pay at the rate of one hour of pay at their regular pay rates for each workday they were denied an unpaid off-duty thirty-minute meal period.

135.   Accordingly, Plaintiff and Class Members are entitled to recover, and hereby seek, an amount equal to one hour of their hourly pay rates per missed off-duty meal period, in addition to any applicable penalties, attorneys' fees, costs of suit, and any further equitable relief this Court may deem just and proper. *See* Cal. Lab. Code §§ 226.7, 218.5, 218.6, 558.1; *see also*, Cal. Civ. Proc. Code § 1021.5.

**<u>Fifth Cause of Action</u>**
**Failure to Provide Rest Periods and Rest Period Premium Pay**
**Cal. Lab. Code §§ 226.7, 218.5, 218.6, 512, 558.1; Cal. Code Regs. tit. 8, § 11090**

136.   Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows:

137.   California Labor Code section 226.7 provides in pertinent part:

(b) If an employer fails to provide an employee a meal or rest or recovery period, . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided.

138.   Pursuant to California Labor Code section 1198, the Industrial Welfare Commission  provides the maximum hours of work and standard conditions of labor for California employees.

139.   Sections 12(A) and 12(B) of IWC Wage Order No. 9-2001 provide in pertinent part:

(A) Every employer shall authorize and permit all employees to take rest periods . . . The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof . . . Authorized rest period time shall be counted as hours worked for which there shall be no

deduction from wages.

140.   California Labor Code section 218.5 provides an award of reasonable attorneys' fees and costs to a prevailing employee in any action brought for the non-payment of wages.

141.   California Labor Code section 218.6 provides in pertinent part:

In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages . . . which shall accrue from the date that the wages were due and payable . . . .

142.   In general, claims for payments under California Labor Code section 226.7 for missed rest period violations must be filed within three years. Cal. Civ. Proc. Code § 338. However, a cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.), as alleged herein, extends the statute of limitations by an additional year, effectively giving employees up to four years to file a wage claim in court. *See* Cal. Bus. & Prof. Code § 17208.

143.   Premium pay for denied meal and rest periods is considered a "wage" rather than a penalty. *See Murphy, supra*, 40 Cal. 4th at p. 1114.

144.   AMAZON's conduct throughout the Class Period, as alleged in further detail herein, violates the aforementioned regulations because AMAZON, as a direct result of it's standardized policies, practices and procedures related to the DSP Program,  failed to properly provide Plaintiff and Class Members lawful uninterrupted off-duty ten-minute rest periods per four hours of work, or major fraction thereof, free from management control, as well as the corresponding required premium pay for denied rest periods.

145.   As alleged in more detail above, AMAZON's standardized policies, practices and procedures related to the DSP Program resulted in the discouragement and denial of Plaintiff and Class Members to receive lawful paid off-duty rest periods throughout the Class Period by, *inter alia*, scheduling them for numerous time-consuming deliveries and lengthy delivery routes, and requiring them to complete all daily pick-ups, deliveries, and other work-related duties, which typically left them no time to take uninterrupted rest periods in order to complete their required duties. Even when they were provided rest periods of some form during the Class Period, those rest periods were typically on-duty, subject to management control, dispatch directions or interruption and continuance of work-related duties.

146.   Relatedly, despite failing to provide Plaintiff and Class Members lawful paid off-duty rest periods, AMAZON also systematically denied Plaintiff and Class Members proper premium compensation at the rate of one hour of pay at their regular rates of compensation for each workday they were denied an off-duty paid ten-minute rest period.

147.   Accordingly, Plaintiff and Class Members are entitled to recover, and hereby seek, an amount equal to one hour of their hourly pay rates per missed rest period, in addition to any applicable penalties, attorneys' fees and costs, and any further equitable relief this Court may deem just and proper. *See* Cal. Lab. Code §§ 226.7, 558.1, 218.5, 218.6; *see also*, Cal. Civ. Proc. Code § 1021.5.

**Sixth Cause of Action**
**Failure to Reimburse for Necessary Expenditures Incurred**
**Cal. Lab. Code §§ 2802, 510, 558.1; Cal. Code Regs. tit. 8, § 11090**

148.   Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows:

149.   California Labor Code section 2802 provides:

(a) An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties. . .

(b) All awards . . . for reimbursement of necessary expenditures under this section shall carry interest at the same rate as judgments in civil actions.   Interest shall accrue from the date on which the employee incurred the necessary expenditure or loss.

(c) [T]he term "necessary expenditures or losses" shall include all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section.

150.   California Labor Code section 2804 mandates that this statutory right cannot be waived.

151.   Section 9 of IWC Wage Order No. 9 provides in pertinent part:

(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer.   The term "uniform" includes wearing apparel and accessories of distinctive design or color.

(B) When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer. . .

152.   Pursuant to California Labor Code sections 510(b) and 2802, employees required to travel between worksites during the workday must be compensated for time spent traveling and for expenses of traveling.

153.   Because an employer's liability under California Labor Code section 2802 is "a liability created by statute," in general claims for unreimbursed necessary expenditures under California Labor Code section 2802 must be filed within three years of the date the

49

employee accrues the expense. Cal. Code Civ. Proc. § 338(a). However, a cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.), as alleged herein, extends the statute of limitations by an additional year, effectively giving employees up to four years to file a claim in court for restoration of money or property acquired by means of unfair competition. *See* Cal. Bus. & Prof. Code §§ 17203 and 17208.

154.   As alleged in more detail above, AMAZON's standardized policies, practices and procedures related to the ISP Program resulted in the violation of the above statutes throughout the Class Period by uniformly denying Plaintiff and Class Members reimbursement for necessary expenditures incurred as a direct consequence of discharging their duties and/or obeying the directions of AMAZON's delivery driver program, including, *inter alia*, work uniform-related items, and necessary tools, personal communication devices,  supplies and other expenditures directly related to driving, parking and delivering packages, without any reimbursement from Defendants.

155.   As a direct and proximate result of AMAZON's failure to provide reimbursement for necessary expenditures incurred throughout the Class Period, Plaintiff and Class Members suffered, and continue to suffer, substantial losses related to such unreimbursed expenditures, including, but not limited to, the use and enjoyment of monies owed, lost interest on monies owed, and attorneys' fees and costs incurred to enforce their rights.

156.   In failing to provide Plaintiff and Class Members reimbursement for necessary expenditures incurred, AMAZON's standardized policies, practices and procedures related to the DSP program derived, and continue to derive, an unjust and inequitable economic benefit at the expense of Plaintiff and Class Members.

157.   Accordingly, Plaintiff and Class Members are entitled to recover, and hereby seek, an amount equal to incurred necessary expenditures, pre- and post-judgment interest, applicable penalties, attorneys' fees and costs, and any further equitable relief this Court may deem just and proper. *See* Cal. Lab. Code §§ 2802, 558.1; *see also*, Cal. Civ. Proc. Code § 1021.5.

### Seventh Cause of Action
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

158.   Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further allege as follows:

159.   Pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., "specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition." Cal. Bus. & Prof. Code § 17202.

160.   "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

161.   "[T]he term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code § 17201.

162.   California Business & Professions Code section 17203 authorizes injunctive, declaratory, and/or other equitable relief with respect to unfair competition as follows:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.

163.   An action to enforce any cause of action under the UCL must be commenced within four years after the cause of action accrued. Cal. Bus. & Prof. Code § 17208.

164.   California Labor Code § 90.5(a) declares:

> It is the policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation . . .

165.   AMAZON's standardized acts and practices in the implementation of the DSP Program in the State of California, as alleged in detail herein, also constitute "<u>unfair</u>" business acts and practices within the meaning of the UCL in that AMAZON's conduct is substantially injurious to employees, offends public policy, and is immoral, unethical,

oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. Such conduct is ongoing and continues to this date. AMAZON had, and have, reasonable alternatives to them, such as complying with all governing wage and hour laws.

166.   By and through the business acts and practices as alleged herein, AMAZON unjustly obtained valuable property, money, and services from Plaintiff and Class Members, forcing them to work under substandard conditions and depriving them of valuable rights and benefits guaranteed by law, all to their detriment and to the unjust benefit of AMAZON, so as to allow AMAZON to gain an unfair competitive advantage over law-abiding employers and competitors. Plaintiff and Class Members lost money and/or property as a result of AMAZON's unfair, unlawful, and/or fraudulent business practices, as alleged herein, including, but not limited to, lost wages and interest, unreimbursed necessary expenditures, and attorneys' fees and costs incurred to enforce their rights.

## II.   <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff and Class Members pray for judgment against AMAZON, as follows:

1.   For an order certifying that this action is properly brought and may be maintained as a class action pursuant F.R.C.P. 23(b)(2) and  23(b)(3).

2.   For an order appointing Plaintiff as class representative of the Class, and the Law Offices of Ronald A. Marron, APLC and Cohelan Khoury & Singer as counsel for the Class;

3.   For an order requiring AMAZON to bear the costs of Class notice;

4.   For an order bifurcating the action into liability and damages stages, or as otherwise efficient for the administration of justice;

5.   **On the First Cause of Action**, for a declaration that AMAZON is a joint employer of DSP Delivery Drivers under California law due to their omnipresent control over all working conditions, job duties, and performance;

6.     **On the Second Cause of Action**, for all unpaid regular wages for unpaid time at the applicable minimum wage, including liquidated damages as required by Labor Code §§ 1194-1197 and IWC Wage Order 9-2001, § 4 in an amount according to proof;

7.     **On the Third of Action**, for all unpaid overtime and double-time wages as required by Labor Code §§ 1194-1197 and IWC Wage Order 9-2001, § 3 in an amount according to proof;

8.     **On the Fourth Cause of Action**, for unpaid Premium Wages for noncompliant meal periods at one hour of regular rate of pay to each Class  member pursuant to Labor Code §§ 226.7, 512, and IWC Wage Order 9-2001, § 11, in an amount according to proof;

9.     **On the Fifth Cause of Action**, for unpaid Premium Wages for noncompliant "Rest Periods" at one hour of pay at the employee's regular rate of pay to each Class member pursuant to Labor Code § 226.7 and IWC Wage Order 9-2001, § 12 in an amount according to proof;

10.    **On the Sixth Cause of Action**, for damages and restitution for failure to pay or reimburse for all reasonable and necessary business expenditures for the Class members as required by Labor Code § 2802 and IWC Wage Order 9-2001, §§ 8-9, in an amount according to proof;

11.    **On the Seventh Cause of Action**, for the UCL Subclass, to recover all restitution for minimum wages, overtime wages, meal and rest period premiums and any other form of wages, including but not limited to vacation wages and reasonable and necessary business expenses that were not paid to members of the "UCL Subclass" during the Class Period as a result of Defendant's unfair, illegal or deceptive conduct. Said restitution may be calculated in accordance with California Business and Professions Code sections 17203 and 17204, including trial of UCL claims by the Court in equity seeking restitution before legal claims, in an amount according to proof;

12.    Pre- and post-judgment interest at the legal rate of 10% in the State of California for all unpaid wages and expenses due, in an amount according to proof;

13.   Reasonable attorneys' fees and costs of suit to the extent permitted by Labor Code §§ 218.5, 1194, 1404, 2802-2804, and/or California Code of Civil Procedure § 1021.5;

14.   An accounting of AMAZON's books and records to determine damages, restitution, and/or interest on all monies due; and

15.   Any such other and further relief as this Court may deem necessary, just, and/or proper.

## III.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby requests a jury trial on all causes of action, claims, and issues so triable.

Dated: February 15, 2019          By:      */s/ Ronald A. Marron*
                                            Ronald A. Marron

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON
ron@consumersadvocates.com
MICHAEL T. HOUCHIN
mike@consumersadvocates.com
651 Arroyo Drive
San Diego, CA 92103
Tel: (619) 696-9006 / Fax: (619) 564-6665

**COHELAN KHOURY & SINGER**
ISAM C. KHOURY
ikhoury@ckslaw.com
TIMOTHY D. COHELAN
tcohelan@ckslaw.com
J. JASON HILL
jhill@ckslaw.com
605 C Street, Suite 200
San Diego, CA 92101
Tel: (619) 595-3001/ Fax: (619) 595-3001
***Attorneys for Plaintiff Jasmine Miller and the Proposed Class***